**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00435-CV**
_____

**IN THE INTEREST OF N.F., J.G., AND O.M.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 18-03-03176-CV**

**MEMORANDUM OPINION**

After a bench trial, Appellants—N.F. and R.G. (collectively Fathers) and M.F. (Mother)—appeal from an order terminating their parental rights to their minor children. The order terminated N.F.'s ("Nolan") rights to his son N.F. ("Junior") (age 11), terminated R.G.'s ("Rick") rights to his son J.G. ("Jack") (age 4), and M.F.'s ("Mila") rights to her children Junior, Jack, and O.M. ("Olivia") (age 2).[1] *See*

---

[1] To protect the identity of the minors, we use pseudonyms and initials to refer to the children, parents, and family members. *See* Tex. R. App. P. 9.8(b)(2).

1

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (H), (N), (O), (2). The order also terminated the parental rights of the alleged father J.L.M.O. ("John") as to Olivia.[2] Nolan, Rick, and Mila appealed the final order of termination. We affirm.

## Background

On March 9, 2018, the Department of Family and Protective Services ("Department") filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. Seven children were named as the subject of this suit, and the children were ages 10, 5, 4, 2, 1, and 3-week-old twins.[3] The petition named Mila as the Mother of all seven children and named Nolan the father of Junior, Rick the father of Jack, and John the father of Olivia.

The petition was supported by an affidavit by a representative of the Department. According to the affidavit, on March 7, 2018, the Department received an intake stating that the Conroe Police Department had been called to a home where two men were arrested for possession of marijuana and drug paraphernalia. The

---

[2] The alleged father of Olivia is J.M.L.O. ("John") but he is not a party to this appeal, and we address him only as necessary to the disposition of the issues raised by the parties to this appeal.

[3] The termination cases pending for four of Mila's seven children were severed and are not part of this appeal.

intake alleged that the drugs and paraphernalia were "in clear access to the children[]" and that the home was "filthy[,]" in need of repairs, and that there were roaches everywhere. According to the affidavit, Mila had seven children and lived in the home with her boyfriend, John. Mila told the Department representative that John "probably smokes marijuana every other day[]" but that she did not know there were drugs in her home. Mila reported that she had twins by C-section three weeks before the Department's visit, and she was unable to clean the house because she was still recovering from childbirth. The affidavit described the home as a two-bedroom mobile home that was "very unsanitary" and "very dirty[,]" with trash and laundry scattered about, holes in the walls, roaches "crawling over everything[,]" and visible mold in the kitchen and bathroom.

According to the affidavit, there had been a previous CPS case where neglectful supervision was alleged due to John's failed drug tests and because he was "under the influence" while caring for the children. The Department sought managing conservatorship of the children due to concerns about the health and safety of the children "due to the unsanitary living conditions" and John's drug use.

3

Testimony of Officer Andrew Lupnitz

Officer Andrew Lupnitz, with the Conroe Police Department, testified that he was called to a trailer home on March 7, 2018, for a report of a loud noise and the odor of marijuana. Lupnitz observed two men on the front porch "cutting open a cigar to take out the tobacco and put marijuana in it[.]" Lupnitz testified that one of the men was John, and that he took both men into custody for possession of marijuana. Lupnitz learned that John lived at the home with his girlfriend Mila. Lupnitz testified that Mila consented to a search of the home, and that Junior, Olivia, and another male child were in the home that day.

According to Lupnitz, the children appeared well-cared-for, but the home was "extremely dirty[.]" Lupnitz testified that there were holes in the floor and walls, roaches "all over the house[,]" exposed electrical wiring, piles of clothes and household items lying about, dirty mattresses, and marijuana and drug paraphernalia within reach of the children. Lupnitz believed that the conditions in the home were dangerous to the children because the exposed wiring posed a risk of fire or electrocution, the holes posed a risk of falling and injury, and the insects posed a risk of sickness. Lupnitz also testified that the drugs and paraphernalia were "out in plain view[]" within the children's reach. According to Lupnitz, Mila told him that the

landlord had not taken care of issues with the home and that she was aware her boyfriend John was using drugs "every other day." Lupnitz also testified that Mila told him she knew there was marijuana in a baby formula container in the living room. Based on what he observed in the home, Lupnitz was concerned that the children were in danger, so he notified CPS. Lupnitz did not see any sign of physical abuse of the children.

Testimony of Brandy Powell

Brandy Powell, a licensed professional counselor, testified that the Department referred Mila to her for counseling services, and she met with Mila in December 2018. Mila completed one session with Powell, which Powell described as an "intake session[,]" and Mila "basically did not attend counseling[]" as she never kept any further appointments and she never returned Powell's calls. In Powell's opinion, Mila needed further individual counseling to help with being a mother and the goal of reunification, and Powell would have addressed parenting skills in additional sessions.

According to Powell, Mila told her she had seven children and she had lived with her boyfriend for six years. Powell further testified that Mila told her the police arrested her boyfriend and then he was deported. Powell testified that she was concerned for the children's welfare based on what Mila told her about the condition

5

of the home. Powell also testified that Mila told her that her boyfriend used drugs but not around the children, and Powell thought Mila was "in denial" about whether her boyfriend used drugs in front of the children. Based on her session with Mila, Powell believed Mila needed further services because her children were living in "horrible conditions[]" and were around people using drugs. According to Powell, the police saw the condition of Mila's home, which was "dirty, had holes in the walls, broken [] water heater, broken windows." Mila reported to Powell that she had asked her landlord to take care of repairs to the home, but the landlord did nothing.

Testimony of CPS Investigator

An investigator for CPS ("Investigator") testified that she was assigned to the case involving Mila's children that originated in 2018. The Investigator believed that seven people lived in the two-bedroom home: Mila, Mila's boyfriend John, and five children. The Investigator testified that Mila had seven children, and the Investigator met Junior and Olivia on March 7, 2018. The Investigator became involved based on a report of poor living conditions and drugs—specifically marijuana—in the home within reach of the children. The Investigator described the home as "a mess."

The Investigator testified that the children were not malnourished, and the refrigerator was well-stocked, but there were roaches in the kitchen. According to

the Investigator, the kitchen cabinets had no doors and there were visible signs that water had leaked underneath and mold was growing. In addition, everything under the sink was accessible to the children, which the Investigator regarded as a danger to the children. The Investigator also observed mold in the bathroom and a hole in the bathroom wall. The Investigator testified that one of the children was sleeping on a "very dirty" mattress and another mattress was up against a window in a manner where it could have fallen on the child. She was also concerned that trash and dirty laundry were lying about the house and contributed to an endangering situation.

According to the Investigator, in the two and a half years she had worked for the Department, Mila's home was "one of the worst homes" she had seen because it was unsafe, dirty, and smelled of trash and garbage. The Investigator did not recall seeing any marks or bruises on the children, and the Investigator agreed that there were no allegations of drug use by Mila. According to the Investigator, Mila told her "no one was going to take her children without a fight [or] a court order[,]" and the Investigator testified that she filed for a court order to remove the children from the home.

The Investigator did not attribute the conditions of the home to poverty because she believed that the home could have been kept clean regardless of income. According to the Investigator, Mila told her that she had been working on cleaning

the home before the police arrived, but she had just had twins and a C-section. The Investigator testified that there had been another CPS case involving the home about a month before this incident, and the previous case was due to John's drug use. The Investigator further testified that this case included "the continuing issue" of John's drug use and Mila's inability to protect or care for the children but also included "new issues with the home[.]" At some point, the Investigator met John at the jail, and she testified she believed he had been deported. The Investigator was also concerned that the Department was called back to the home only a few weeks after a previous case for a similar situation. The Investigator explained:

> The home was definitely a concern, but the fact that the Department was involved again because the mother was failing to keep [John] away from the children knowing that he was a drug user because in the previous case [], she had said that he wasn't in the home because he failed drug tests for the Department. And then as soon as the case closed, within three weeks, he's back in the home using drugs again.

The Investigator was concerned that Mila failed to protect the children because Mila knew about the drugs, John left drugs in the home, Mila allowed John back into the home after he failed drug tests, and the drugs were accessible to the children.

In the previous CPS case, Mila had told the Investigator that John was Olivia's father and the Investigator believed Mila had told her Rick was Jack's father and the Investigator did not think Rick was surprised by this. The Investigator recalled that the only information she had for Rick was his name, date of birth, and a Huntsville

address, but she did not go to Rick's home because she did not know where he lived. According to the Investigator, she contacted Rick by phone to advise him that CPS was involved, but he never called her back, even though she left a message with him. The Investigator testified that Mila refused to give contact information for the other fathers. The Investigator agreed that the family service plan stated "[n]o criminal history for Mom[]" and "Mom protected kids from fathers that use drugs."

Testimony of the Court Appointed Special Advocate

The Court Appointed Special Advocate ("CASA") testified that she had been the court-appointed guardian ad litem for Junior, Jack, and Oliva since March 2018. The CASA recommended that it was in the children's best interest to remain in their current foster placements. The CASA testified that it was in the best interest of the children to terminate the parental rights of all the parents of all three children. The CASA testified that she believed it would substantially impair the physical health or emotional welfare of the children for the parents to have primary custody because children need a safe environment with protective parents, and the parents in this case were not providing stability to the children.

The CASA recalled that she met Rick at court in March 2019 and she talked with him to see if he wanted to have a visit, but she was informed that he preferred to wait for the DNA results. According to the CASA, after the DNA results came

9

back in May, she contacted Rick's attorney to speak with him, but never heard back from anyone. Despite calling and texting Rick multiple times, she was unable to speak with him.

The CASA was not surprised that Mila was not in court when the CASA testified. The CASA testified that she visited with Mila when the children had visits, and that sometimes Mila was not in a good mood, and she used "a lot of foul words." It was difficult for the CASA to say whether Mila had a bond with all the children, but the CASA believed Mila did have a bond with the infant twins. The CASA did not have any contact with John, the father of Olivia. According to the CASA, the last time Mila had a visit with the children was in March, and there was a court order suspending visits thereafter, but the CASA did not know why the order was put into place.

The CASA had most recently seen Junior, Jack, and Olivia within two weeks of trial, and she reported things were "very good." The CASA understood that there was a possibility that a family would adopt Junior upon termination and that Junior was then in a "protected, safe environment." According to the CASA, Junior's behavior "declined[]" after visits with his parents, including a decline in grades and complaints from his teachers.

<u>CPS Caseworker's Testimony</u>

A caseworker ("Caseworker") for CPS testified that she had been assigned to this case since it began in March 2018. The Caseworker testified that she prepared a family service plan for Nolan, Rick, and John. And, she agreed there was a service plan for Mila. Mila's, John's, and Nolan's service plans were admitted as Department's Exhibits 5, 36, and 37. The Caseworker testified that she believed it was in the children's best interest for each parent's parental rights to be terminated and for all three children to be adopted by the foster parents who are the current caregivers. She testified that giving the parent primary custody would significantly impair the physical health or emotional well-being of all the children. According to the Caseworker, adoption was preferred over letting the foster parents merely be a primary custodian because the children need permanency, safety, and stability. According to the Caseworker, the Department would continue sibling visits. The Caseworker did not believe it was in the children's best interest to remain in the Department's conservatorship for a lengthy period because "they would be stuck in limbo[]" and they deserve a life with loving parents and a permanent home.

Based on photographs of Mila's home, the Caseworker believed the conditions of the home in which the children had lived with Mila had put the children in danger. The Caseworker testified that she attempted to work with Mila on her

11

service plan during the case and met with Mila and her attorney about the service plan "about five months into the case." The Caseworker agreed that one of Mila's strengths was Mila did not appear to have a substance abuse problem. She also agreed that one of the initial concerns with Mila was housing, and that the CPS supervisor had instructed that the Department could only help Mila with housing if Mila would initiate some of the items on the service plan. The Caseworker further testified that the goal changed from reunification to adoption "[b]ecause the services were not completed." According to the Caseworker, Mila did not provide proof of employment and did not complete a drug assessment, but she did maintain monthly contact, attend a parent collaboration group meeting, complete a psychological assessment, and she completed one class of individual therapy. The Caseworker testified Mila refused to take drug tests at Volunteers of America, that it was important for Mila to take drug tests so that the Department could rule out her own drug use because the allegations in the case related to drugs and drug paraphernalia and the Department wanted to make sure the children were free from exposure to all substance abuse. The Caseworker also testified that she could not rule out drug use by Mila because Mila did not go for drug testing when the court requested it, and even though Mila did not complete the initial drug assessment, there was "another avenue" available and she could have completed a drug assessment.

The Caseworker testified that Mila was consistent with making visits as long as CPS provided transportation, and that Mila was good with the children during her visits. The Caseworker recalled that Mila reported that she was working at a fast food restaurant and cleaning houses and she said she was paid in cash. The Caseworker described Mila as "combative at first," "abrupt[,]" and "a handful" who sometimes went on a rage and cursed, and that it was necessary sometimes "to step back with her." The Caseworker testified that Mila "could go from being calm [] to just being outrageous and out of control at times[]" and that such behavior was a red flag about how she might behave around the children. According to the Caseworker, in one visitation with the children, Mila "went off" on the CASA and was "actually in her face," and the Caseworker intervened and pointed out to Mila that the children were observing her behavior. The Caseworker testified that Mila sent her texts that were "kind of vulgar[]" and included "cussing[]" and told her "Do not call me no[] more[,]" and several times Mila told the Caseworker to leave her alone. The Caseworker denied ever blocking Mila's calls. The Caseworker did not know where Mila was living, Mila had not given her any information about Howard, the man with whom she was currently in a relationship, which was a "concern" because to move the children back with Mila, it would be necessary to do a full home study on Howard. The Caseworker testified that she thought it was in the children's best

13

interest not to visit with Mila again because of Mila's "lack of effort[]" on anything other than making visits, the lack of permanency, safety issues, the lack of appropriate housing, and Mila gave "pushback" on any other part of her service plan. The Caseworker also had safety and permanency concerns about returning the children to Mila and that there was a pattern of "drug history[]" with the fathers in this case.

According to the Caseworker, Mila told her that John had been arrested at the beginning of the case and deported to Mexico, and the Caseworker did not have any communication with John. The Caseworker prepared a service plan for John because Mila named him as Olivia's father. The Caseworker testified that John did not complete any of the services in his plan and did not visit the children or provide any support for them during the case.

According to the Caseworker, she first had in-person contact with Rick during the court proceedings, prior to the DNA testing. The Caseworker testified that Rick wanted DNA testing, and when she called him with the results in May 2019 showing that his DNA "was 99.99 percent that he was [Jack's] father[,]" Rick was quiet and then said "Okay. . . . That was good." The Caseworker then asked Rick how he wanted to proceed, and he responded, "Let me get back with you[]" and ended the call, but he never did get back with her. The Caseworker testified that she called and

texted Rick about visitations, but "there was no response." According to the Caseworker, she set up services for Rick, including substance abuse assessment and drug screens. The Caseworker also recalled that she let him know that he tested positive for cocaine after a drug screen, and that when the court had ordered the drug screen, Rick admitted to her that he had been using and he said he knew he was going to test positive. The Caseworker testified that Rick had not been to any drug screens after the positive test, so that the "substance issue and concern" remained unaddressed. When asked what Rick's barriers were to receiving custody of Jack, the Caseworker stated that Rick failed to contact her about visitation, he lacked permanency, and he failed to provide information about the sister with whom he wanted Jack to live. According to the Caseworker, Rick had never received visitation through the Department, and she did not believe Rick would be able to provide a safe and stable environment for Jack because "the efforts were not there. He didn't make any efforts to call back to make visitation plans. There was no contact." The Caseworker thought termination of Rick's parental rights was best because:

> . . . [Jack] does not know him. [Jack] does not know him as a father, the permanency of this child. There [were] no visitations. He had my number at the time. He could have visited anytime. He could have texted me back at any time and said: I want a visit with my child.
> . . .
> There was nothing.
> . . .

15

He does not know him, and there is no bond between [the child] and his father at all.

The Caseworker also testified that Nolan did not complete his service plan except for one drug screen. The Caseworker agreed there were no allegations of abuse against Nolan. According to the Caseworker, she had talked with Nolan several times during the case, and he told her he had never been told about a service plan, so she responded, "I'm telling you about it right now." The Caseworker testified that Nolan had supervised visitation with Junior "about once a month[]" and that is what Nolan wanted and he did not ask for more. At some point, Nolan texted the Caseworker to say he did not want his visit that month because he had left court, he was not going back to jail, and "he was on the run." The Caseworker agreed that Nolan was not able to provide for his son and, even if Nolan were not in jail, the Department would not recommend returning Junior to Nolan because Nolan has no stability or permanency and he does not have a place for Junior to live. The Caseworker did not believe that Nolan would be able to provide for Junior at any time in the near future, and he had not provided any financial support for Junior during the case.

According to the Caseworker, Junior was eleven years old and CPS has been involved in Junior's life for several years. The Caseworker testified that Junior attended therapy biweekly for issues with oppositional defiant behaviors. Junior had

16

been in foster care since the case started. He was originally placed with his paternal grandparents, but after about three months, they decided to move out of state and did not want to take Junior with them. The Caseworker testified that Junior did not have special or medical needs, but he still had issues at school with "oppositional defian[ce], talking back, speaking out of turn, [and] excessive talking." According to the Caseworker, the Department's goals for Junior were unrelated adoption with his current foster parents, who are licensed and seeking to adopt, but she did not have confirmation that the foster parents wanted to adopt Junior although she thought it was "a very big possibility[.]" The Caseworker testified that Junior liked living with his current foster parents and they were meeting all his needs.

The Caseworker testified that she had visited Jack and Olivia monthly during the case, and her visits were about an hour long. According to the Caseworker, the Department's goal for Olivia was adoption by the current caregivers, who were willing to adopt, and Olivia and Jack were placed together. According to the Caseworker, Jack and Olivia's foster parents were calm, loving, kind, played with the children, and met all their needs. The foster parents had taken Jack to a specialist for his asthma and had also taken both Jack and Olivia to speech therapy. The Caseworker had observed that Jack and Olivia had a bond with the foster parents. She further testified that it would be disruptive for Rick to have visitation with Jack

17

because Jack does not know his father, he has already been through "a lot of trauma[,]" and he had never met with his father that he could remember.

Testimony of Nancy Villareal

Nancy Villareal testified that she is a counselor and parenting teacher for the Cradles Project, which she described as a parenting program that assists in the counsel and recovery from drug or alcohol abuse. According to Villareal, Mila was referred by CPS to the program in April 2018. Villareal testified that Mila completed the program, but it took her a long time because she had to restart the program due to a lot of "no-shows." Mila reported to Villareal that she had transportation issues that made it hard for her to attend, but according to Villareal, when she made arrangements for meetings closer to Mila, Mila still would not show up. Villareal further testified that Mila had told the class they were trying to "brainwash" them and at times Mila was very disrespectful and very hateful about the material being presented because she was cursing and not wanting to be there. According to Villareal, Mila did not ask questions or give an indication she was interested in learning or applying new strategies.

<u>Mila's Testimony</u>

Mila testified that she had seven children and she provided their birthdates.[4] According to Mila, Nolan was Junior's father, Rick was Jack's father, and John was Olivia's father. Mila explained that John had been living with her, and the last time she saw him, he was in jail "before he got deported[]" to Mexico in about May 2019, and she understood he was going to get ten years' prison time in Mexico. Mila testified that John knew he was Olivia's father although John was not listed on Olivia's birth certificate because Mila was still married to Nolan when Olivia was born. According to Mila, she had tried to divorce Nolan, but it was not possible "because he has a lot of trouble with the law." Mila and Nolan stopped living together about six months after they got married. According to Mila, Nolan lied to her and he was "with" someone else who was pregnant when they started seeing one another, and when she told Nolan she was pregnant, he told her to get an abortion.

Mila and John began their relationship near the end of 2015. According to Mila, John took care of the family and did not abuse the children. There was "supposedly some sexual abuse allegation" against John that CASA brought up to her, and when she told John about it, he told her he was never coming back because

---

[4] Based on the birthdates given, the youngest children (twins) were about a year-and-a-half old at trial, and the oldest was almost twelve.

of it. Mila described her relationship with the father of another one of her children as "abusive[]" and she testified that she received a "busted blood vessel" in her eye as a result of his abuse.

Mila recalled the day when the police came to her home and arrested John for possession of marijuana. According to Mila, she had left the home that day to take two of her children to her parents' house and "none of that stuff that they found was in the home." Mila also testified that she was inside the home that day, and she was going to lie down after having taken Hydrocodone for pain resulting from her C-section. Mila denied knowing John and the other man were doing drugs at the house. According to Mila, she did not know about any drugs in the house and John must have brought them into the home. Mila agreed that she told the CPS Investigator that she could not remove her children from the home without a court order and that CPS would have to fight her legally. According to Mila, the Investigator lied in the affidavit supporting removal.

Mila testified that on the day the police showed up, Rick was going to pick up Jack from her parents' house, and she had contacted Rick through Facebook to tell him where her parents lived. Mila agreed that Rick knew how to contact her, he could always have reached her through Facebook, and he could have visited Jack any time prior to removal. Mila testified that she had told Rick when she was

20

pregnant with Jack and that Rick was Jack's father. According to Mila, Rick saw Jack at the hospital when he was born, but "after that, no contact[]" except for one visit when Jack was three or four months old. Mila explained that her relationship with Rick ended because it was unhealthy and Rick was "controlling[.]" Mila believed Rick should be in Jack's life because "he's [Jack's][] father[]" and "that's his child." Mila did not know that Rick had tested positive for cocaine during the case, but she knew Rick used marijuana during their relationship. Mila agreed she did not know much about Rick at the time of trial, she believed it was clear that Rick was Jack's father, and Rick never denied to Mila that he was Jack's father. According to Mila, even before the DNA testing, Rick had told her "That's my son. I want to see my son." Mila did not believe that Rick was a danger to or ever harmed Jack. According to Mila, the clothing and car seat that Rick bought for Jack was for use at Rick's home.

According to Mila, Nolan, Junior's father, was not a bad person, but he "makes stupid decisions[.]" Mila described Nolan as "trouble and money hungry[]," and most of his theft cases were because he stole things to make more money to "live a life that's not real that's depicted on television[.]" Mila understood that Nolan's most recent case resulted from stealing televisions from Walmart. Mila testified that she had talked with Nolan about a couple of months earlier, and he told her he did

21

not have a place for Junior because Nolan was living with his brother and did not want to "put his brother or his family in that situation." Mila agreed that Nolan did not have a stable living environment and she understood Nolan had gotten caught trying to get into Canada. According to Mila, Nolan had a theft case, did not want to take a plea because of concerns about improper evidence, and he fled to New York but had talked about going to Canada. Mila did not think that Nolan's situation would be safe because he left while the case was ongoing.

Mila did not recall any marijuana anywhere in the house ever, and she had not seen drug paraphernalia in the house—including any of the items reported by the police such as a digital scale with residue, razor blades, nails with residue, small bags with smoking papers, a clay pot with "roaches" inside, a "roach" in a bedroom, and a marijuana grinder with residue. She told the police that John smoked but not at the house, but she did not regard it as "an issue." Mila agreed that John smoked marijuana every other day the whole time she knew him, but she said the children "weren't around it[,]" she was not aware that John had drugs in the house, and John would go across town to his cousin's house to smoke.

Mila described Junior as a good, smart, and sweet boy who liked reading and school. Mila did not think Junior seemed happy in his current placement because he told her he was having issues with other children in the home. Mila described Jack

22

as "[r]ough and rowdy[,]" energetic, and interested in trucks, dinosaurs, and guns. Mila described Olivia as a happy, "unique" girl who loved watching cartoons, loved her brother, and loved her father. Mila testified that she had asked Olivia's doctor about her night terrors and crying at night, but Olivia had no other medical conditions. According to Mila, Jack and Olivia have a special bond and she would like for them to be together, but she did not want them to remain in their current placement because Mila had been cut out of family gatherings and she and her parents were no longer allowed to visit. Mila did believe the foster parents were taking good care of the children.

Mila recalled that at some point, she had received a copy of her service plan and that she had discussed the service plan with the Caseworker "[s]omewhat." According to Mila, she completed two psychological assessments, but she disagreed that it was recommended that she get individual therapy. Mila agreed that she saw Powell for one session, but according to Mila, Powell did not set up any additional sessions. Mila agreed she completed a parenting class, but she stated that she did not get anything out of the class and that she went because she was forced to go and she thought the parenting class "tr[ied] to take God out of parenting[.]" Mila also agreed that she did not complete a drug assessment and she said "drugs weren't the issue." According to Mila, she received calls to go for drug tests, and she only went to two

23

of them, because her "ID was broken" and she did not have time to take care of the issue with her ID. Mila recalled that she went to Volunteers of America for a drug evaluation, and when they asked for a drug swab for a drug test, she left because an employee told her "she knows a person with a drug problem when she sees one." Mila did not return, and she told CPS she was not allowed back because of her behavior. Mila also testified that "drugs weren't supposed to be part of the issue[,]" that she did not understand why she needed to be drug-tested, and that she chose to decline rather than to comply and show that she was clean.

Mila believed that the goal in the case was changed from reunification to adoption because of the condition of her home and she was not using drugs. Mila testified that her landlord did not fix anything in the home, and her house was "pretty much ransacked" because she could not lift anything after her C-section. Mila acknowledged that the water heater, kitchen cabinets, porch roof, and porch steps needed repair and that the steps were "a little bit of a hazard." Mila understood there was a bug problem at the house, but she testified that she had purchased bug bombs the day the police showed up. According to Mila, the children's mattresses were stained, but not dirty. Mila testified that most of the bags lying around the house were clothes, not trash, and some of the bags contained clean sheets that she had just washed. When asked about the holes in the wall, Mila replied:

24

Yes, but I didn't put those there. They were there when we moved in. Like, the trailer was raggedy when we moved in it. The [] water heater didn't even work. I complained to the landlord about it. He told me he would fix it. He never fixed anything.

Mila testified that she tried to look for other housing and she had applied for housing assistance, but that CPS never gave her paperwork for housing and she understood that CPS told her they could not give her housing because the goal had changed from reunification to adoption.

Mila denied having any criminal convictions except for a felony conviction when she was a juvenile. She agreed that the children were current on shots and medical care and that there was always food in the house. Mila testified that, at the time of trial, she had been working at a fast food restaurant and working for herself cleaning houses "since April of last year[]" and her take-home pay was about $600 a month. According to Mila, she had not been "allowed to do anything" for her children, including providing financial support and that "running back and forth in between court and trying to make it to visits" interfered with her ability to financially support herself. At the time of trial, Mila was living with a boyfriend Howard, a barber, but she had not provided information about him to the Department because Howard asked her not to because he did not want to be involved in the case. Mila was not aware that Howard had any criminal history, but she had not discussed the

matter with him because she did not think it would be important to see whether anything in his background would be a danger to her children.

Mila admitted she and the Caseworker "had some differences" and that she believed the Caseworker had blocked her on her phone because her attitude "wasn't as bubbly as she wanted it." According to Mila, she did not have a relationship with the Caseworker after the Caseworker blocked her calls. Mila agreed that at some point when she called the Caseworker, she had an opportunity to leave a message, but she did not want to "talk to the voice mail[,]" she wanted to speak with a person, and she did not leave a message. Mila agreed that she walked out of the trial at one point because she was upset. Mila told the court she knew the children could not be returned to her at the time because she was "not in the position quite right now" and she requested visitation and a chance to get her children back.

Rick's Testimony

Rick testified that he was Jack's father, that Mila had told him when she was pregnant that he could be Jack's father, and that he found out he was Jack's father from DNA test results. According to Rick, he and Mila had dated, but they had broken up at the time she became pregnant and were not in a relationship, and he suspected he might not be Jack's father because he and Mila fought and broke up all the time. Rick testified that when he finally found out Jack was his child, "[i]t was a

26

relief, but I was excited." Rick knew Mila was married to Nolan, but he had not met Nolan. Rick was not sure when Jack was born and did not know Jack's birthday. Rick testified that he was "trying to fight for [his] rights[]" and he wanted Jack placed in his home, but he also testified that he was not asking for possessory rights but only visitation. He agreed that, if given visitation, he would participate actively with Jack and provide for him financially. Rick also agreed he would be "fine" with supervised visits.

Rick testified that he has two teenaged children that have never lived with him, although he has a relationship with them. He further testified that he had been working for a pool cleaning company for about four months where he makes about $100 a day, and before that he did school bus upholstery work for about ten years. Rick had been renting a room at his cousin's home for about a month, had previously lived with his sister for about six months, and before that, had lived with his cousin for about five years. According to Rick, he had only seen Jack twice, once when he was a baby, and once in March 2018 before the children were removed. Rick testified that he did not take any steps to establish that Jack was his son because he did not know how to reach Mila. He testified that he had once spent about $500 for clothes and a car seat for Jack, and he believed Jack was his son at the time. According to

Rick, when Jack had stayed with him, Rick had not observed any problems with Jack's sleeping or Jack eating from the trash.

According to Rick, Mila was "a good person[]" but had "a bad attitude[.]" Rick testified that he had seen the photos of Mila's home, and he thought it was "kind of messed up[,]" "bad[,]" and he wouldn't want his child living in those conditions. Rick had not seen Mila neglect the children or be violent, but because he did not live with her, he did not know whether the children were safe with her.

Rick was aware that he had tested positive for cocaine during the pendency of the case, but he denied that he had done drugs since that positive test result. He agreed he had talked with the Caseworker a couple of times, who told him the results of the DNA testing. Rick denied having any criminal history other than "old misdemeanor stuff" and denied using any drugs other than cocaine.

Rick agreed he had not asked the Caseworker about visitation or that Jack be placed in his home. According to Rick, the Caseworker had not asked him to do more drug testing or services. Rick testified that he did not reach out to the Caseworker because he was working or coming back from work, and he never called her back. Rick agreed he went through his attorney to request visitation, but he recalled that the Caseworker told him he could not have visitation until the DNA test results were available and that even after the results were available, the Caseworker

28

did not allow him visits. Rick also testified that the CASA had texted him about setting up visitation, but he never responded. According to Rick, neither the CASA nor the Caseworker had come to his home. Rick denied that he ever received a service plan.

Testimony of Foster Parents of Jack and Olivia

A married couple ("the Fosters") testified that Jack and Olivia, then aged three and two, had lived with them for over a year, and the Fosters planned to adopt both children. The Foster Father believed it was in Jack and Olivia's best interest to stay with the Fosters. The Foster Mother testified that adoption was important for the children's stability, healing, and for them to "move on from some of the things that they've witnessed[.]" The Foster Mother testified that Mila is a distant cousin. According to the Foster Father, they first met the children after Mila called them and told the Fosters to come to the CPS office to take Jack, and Olivia came to live with them later. Also living with the Fosters were their two teenaged children. Each child had a bed in the home: Jack shared a bedroom with the Foster's son, and Olivia shared a bedroom with the Foster's daughter. The Foster Father agreed that he and his wife were licensed to foster. The Foster Father testified that he had held his job for twenty-two years and that he had enough income to support all the children, including Jack and Olivia. The Foster Father agreed that he and his wife had always

29

had stable housing, and they had been in their current home about three years. The Fosters testified that neither of them had any criminal history.

The Foster Father agreed that Jack and Olivia had integrated into their family and were bonded with the family. The Foster Father had never heard Jack or Olivia ask about their mother or father, and Jack and Olivia call the Fosters "mommy" and "daddy." According to the Foster Mother, Jack and Olivia had been in therapy "as needed[.]" The Foster Mother described the children as flourishing, stable, doing amazing, clingy, cuddly, and with an extreme need for security and closeness.

The Foster Father testified that when Jack started living with them, Jack was "a little quiet, a little skittish." The Foster Mother described Jack as initially quiet, reserved, fearful and "kind of whiny[.]" The Fosters further testified that, since Jack had been living with them, he had become potty-trained and was doing a lot of positive things. When Jack first arrived, he would eat food that he had dug out of the garbage can. Olivia did not eat as much when she first came to the Fosters' home. The Foster Father believed the children were making emotional progress and had become able to sleep through the night. The Foster Mother testified that initially Jack had night terrors, would talk in his sleep, would kick and throw off the blankets, and seemed "stuck in a nightmare." She further testified that Jack hated the dark and would scream if the light was turned off, and she did not perceive it as a normal fear

of the dark. The Foster Mother also testified that at first, Jack would scream if a door was shut or if he was left in the bathroom by himself and that "[i]t was something about bathrooms that freaked him out so bad." According to the Foster Mother, Jack no longer had these issues and it took him eight or nine months to get over his fear of the dark. The Foster Mother also testified that Olivia initially would scream, bang on the door, and "freak[] out[]" if Olivia was in the bathroom alone, and that it took a long time for her to get out of the practice of eating out of the trash. According to the Foster Mother, Olivia's night terrors had become a "once in a blue moon" occurrence. The Foster Father testified that the children went to day care, and although Olivia initially would bite other children, she had stopped doing that, and both Jack and Olivia had good interactions with other children. According to the Foster Mother, Olivia initially had a strong fearful reaction to a Hispanic worker at the day care and she screamed and cried. The Foster Mother testified that at the time of the trial, both children were doing "great" in day care.

The Foster Mother testified that initially the children were unhealthy when they came to the Fosters' home, that Jack had strep, the flu, and a double ear infection, and Olivia had allergy problems. According to the Foster Mother, both children had inhalers, both had allergies, and Jack was diagnosed with asthma and had received breathing treatments. The Foster Mother further testified that Jack

31

needed someone to be "on top of his" respiratory issues and medical needs and that Jack wheezed badly if he missed a treatment.

The Foster Father described Mila as "strong-willed" and testified that she could be "real difficult[,]" and he had concerns that Mila would not prioritize the children's needs, did not care about the children, and "what she wants is what she wants." According to the Foster Father, the only contact they had with Mila during the case was during visits. The Foster Father observed that sometimes after visits with Mila, Jack would "revert back to some of the stuff that was going on before[,]" such as having trouble sleeping, crying for no reason, and being skittish, and that Jack was "always good when he doesn't see her." The Foster Mother testified that she was concerned about the children's behavior after seeing Mila and she thought the children were "[t]riggered" after visitation with Mila. The Foster Father denied that he had ever seen Mila mistreat the children. The Foster Mother testified that, in her experience, Mila would come to her to talk about issues but would not follow her advice. The Foster Mother also testified that, in the years prior to the current case, Mila would sometimes ask the Foster Mother to pay Mila's phone bill, and in 2016, when Mila was pregnant with Olivia, Mila told her that John had threatened to hit her if she did not make him a sandwich, and the Foster Mother worried about Mila's safety with John. According to the Foster Mother, at one point Mila sent her

a long text message and the Foster Mother blocked her because Mila's communication was "really mean and hateful[.]" The Foster Mother testified that neither Mila nor the fathers had offered to help provide for the children's needs during the case. The Foster Mother also testified that Mila failed to show up for visitation twice.

The trial court took judicial notice of pleadings, orders, and service documents filed in the case. Exhibit 1 was admitted by agreement, which was an "Order to Issue Capias Set at No Bond; Defendant Did Not Return to Court for Guilt/Innocence Phase of His Jury Trial" for Nolan, signed April 12, 2019. Exhibit 2 was admitted, which was an April 2019 indictment for Nolan on the charge of possession of cocaine. Exhibit 8 was admitted, the results of DNA testing for Rick and Jack. Exhibit 9 was admitted, an affidavit of business records that contained drug test results for Rick, which showed positive results for cocaine and marijuana. Exhibit 20 was admitted, an order from 2018 showing a deferred adjudication for Nolan for the offense of fraudulent use of or possession of identifying information, placing Nolan on community supervision for five years. Exhibits 21 through 29 were admitted, photos of Mila's home taken on the day of the initial CPS report.

During the bench trial, Nolan's attorney made an oral motion for a continuance and told the court:

. . . So in this case, my client has been coming to the court the whole time and he -- I think he had a trial -- he had a trial in -- a criminal trial. And, apparently, he took off and -- and he was arrested last week on the border between [the] United States and Canada. And I think he's in New York right now waiting to be extradited to Texas.

So if he's not here today, it's not because he doesn't want to be here. It's because he can't be here because the State had him detained in New York. And this happened -- you know, I knew about the fact that he was stopped and he was in New York a couple days ago. That's why I didn't file a motion before.

So that being said, I'm asking for a continuance because my client is not here. He's always been here, and it's not his fault. . . .

The trial court denied Nolan's motion for continuance.

Following the bench trial, the trial court signed an order finding that termination of parental rights was in the children's best interest and terminating Nolan's parental rights to Junior, Rick's parental rights to Jack, and Mila's parental rights to Junior, Jack, and Olivia.[5] The trial court found termination of Nolan's parental rights under 161.001(b)(1)(D), (E), and (O); and termination of Rick's parental rights under 161.001(b)(1)(D), (E), (H), and (N); and termination of Mila's parental rights under 161.001(b)(1)(D), (E), and (O).

### Issues on Appeal

Appellant Nolan raises the following issues on appeal:

1. The trial court lost jurisdiction over the case under § 263.401 by failing to commence trial within one year, resulting in a void judgment.

---

[5] The decree also terminated John's rights to Olivia, but John did not appeal.

2. The trial court did not have proper personal jurisdiction over appellant [Nolan].

3. The evidence was legally and factually insufficient to support termination of Appellant [Nolan]'s parental rights under § 161.001(b)(1)(d).

4. The evidence was legally and factually insufficient to support termination of Appellant [Nolan]'s parental rights under § 161.001(b)(1)(e).

5. The evidence was legally and factually insufficient to support termination of Appellant [Nolan]'s parental rights under § 161.001(b)(1)(o).

6. The evidence was legally and factually insufficient to support a finding that termination was in the best interest of the child [Junior].

7. Appointment of the Texas Department of Family and Protective Services as sole managing conservator was void for lack of jurisdiction.

8. The evidence was legally and factually insufficient to support the appointment of the Texas Department of Family and Protective Services as sole managing conservator.

Appellant Rick raises the following issues on appeal:

1. The trial court lost jurisdiction under § 263.401 by failing to commence trial within one year, resulting in a void judgment.

2. The trial court's failure to provide notice of trial to all parties resulted in improper start of trial.

3. The trial court erred by denying Appellant [Rick]'s Motion to Strike Amended Pleading.

35

4. The trial court erred by ordering termination under Texas Family Code § 161.0001(b)(1) without adjudicating parentage of the appellant father.

5. The evidence was legally and factually insufficient to support termination of Appellant [Rick]'s parental rights under § 161.001(b)(1)(d).

6. The evidence was legally and factually insufficient to support termination of Appellant [Rick]'s parental rights under § 161.001(b)(1)(e).

7. The evidence was legally and factually insufficient to support termination of Appellant [Rick]'s parental rights under § 161.001(b)(1)(h).

8. The evidence was legally and factually insufficient to support termination of Appellant [Rick]'s parental rights under § 161.001(b)(1)(n).

9. The evidence was legally and factually insufficient to support a finding that termination was in the best interest of the child [Jack].

10. The evidence was legally and factually insufficient to support the appointment of the Texas Department of Family and Protective Services as permanent managing conservator of the child [Jack].

11. The trial court improperly admitted drug test as business records.

Appellant Mila raises the following issues on appeal:

1. The trial court erred when it terminated the parental rights of Appellant mother pursuant to the ground for termination found in Texas Family Code section 161.001(b)(1)(D).

2. The trial court erred when it terminated the parental rights of Appellant mother pursuant to the ground for termination found in section 161.001(b)(1)(E) of the Texas Family Code.

36

3. The trial court erred when it terminated the parental rights of Appellant mother pursuant to the ground for termination found in section 161.001(b)(1)(O) of the Texas Family Code.

4. The trial court erred when it found that termination was in the best interest of the child and requests reversal and remand of this issue.

5. The trial court erred when it found that termination was in the best interest of the children, [Olivia], Jack, and Junior, and requests reversal on this issue.

Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence, that is, "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *see also In re J.L.*, 163 S.W.3d at 84. We will affirm a judgment of termination if any one of the statutory grounds is supported by legally and factually sufficient evidence and the best interest finding is also supported by legally and factually sufficient evidence. *In re C.A.C.*, No. 09-10-00477-CV, 2011 Tex. App. LEXIS 3385, at \*\*13-14 (Tex. App.—Beaumont May 5, 2011, no pet.) (mem. op.).

37

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of the witnesses. *See id.* at 109 (quoting *In re J.L.*, 163 S.W.3d at 86-87); *In re L.M.I.*, 119

38

S.W.3d 707, 712 (Tex. 2003) (explaining that an appellate court should not reweigh the evidence or "second-guess" a trial court's resolution of disputed evidence). The trier of fact may draw reasonable and logical inferences from the evidence presented. *See In re E.N.C.*, 384 S.W.3d 796, 804 (Tex. 2012) (citing *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997)).

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interests. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (applying previous version of the statute); *In re C.M.C.*, 554 S.W.3d 164, 169 (Tex. App.— Beaumont 2018, no pet.) (same). Generally, we will affirm the termination order if the evidence sufficiently establishes any statutory ground upon which the trial court relied in terminating parental rights as well as the best interest finding. *See In re A.V.*, 113 S.W.3d at 362. However, given the potential future consequences of a 161.001(b)(1)(D) or (E) finding for a parent to a different child, due process and due course of law requirements mandate that a court of appeals review and detail its analysis for a (D) or (E) finding. *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam).

Challenges to Subject-Matter Jurisdiction

In their first issues, Nolan and Rick argue that the trial court lost jurisdiction under section 263.401 by failing to commence trial within one year of the temporary order that named the Department temporary managing conservator, thereby resulting in a void judgment. Nolan's seventh issue also argues that appointment of the Department as sole managing conservator was void for lack of jurisdiction because trial did not commence within the one-year deadline imposed by section 263.401.

We review de novo issues that implicate a court's subject-matter jurisdiction. *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018). The Department filed its original petition on March 9, 2018, and therefore we apply the amendments to section 263.041(a) that took effect on September 1, 2017. *See In re H.B.C.*, No. 05-19-00907-CV, 2020 Tex. App. LEXIS 669, at \*\*27-28 (Tex. App.—Dallas Jan. 23, 2020, no pet.) (mem. op.) (citing *In re M.M.*, No. 05-19-00329-CV, 2019 Tex. App. LEXIS 8270, at \*2 (Tex. App.—Dallas Sept. 11, 2019, pet. denied) (mem. op.); *In re T.W.*, 557 S.W.3d 841, 843 n.2 (Tex. App.—Amarillo 2018, pet. denied)). The relevant portion of section 263.041 states:

> Unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b-1), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court's jurisdiction over the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child

40

relationship or requests that the department be named conservator of the child is terminated and the suit is automatically dismissed without a court order.

*See* Tex. Fam. Code Ann. § 263.401(a). The dismissal deadline in section 263.401(a) is jurisdictional, and if the court fails to meet it, dismissal is automatic. *See id.*; *In re K.B.*, No. 09-19-00239-CV, 2019 Tex. App. LEXIS 10570, at \*8 (Tex. App.— Beaumont Dec. 5, 2019, no pet.) (mem. op.).

The trial court entered a temporary order appointing the Department as temporary managing conservator of all three children on March 9, 2018. On February 27, 2019, the trial court called the case for trial and the attorneys for all parties stated their appearances. The trial court addressed several pretrial matters, including motions for continuance, and the trial court denied all motions for continuance. The trial court noted

> . . . we do have a dismissal deadline looming.
> And I am not inclined -- I don't see anything in the pleadings, the motions for continuance, that demonstrates to me that we have an extraordinary circumstance that would warrant a six-month extension. . . .
> However, the best I can do on this case is if everyone is okay with me hearing this case and waiving de novo then I can start you today and call one witness, ask a couple of questions, and then we can recess the matter.

The Caseworker and the CASA were sworn in, and the CASA testified that she had been assigned to this case since the case opened and that her recommendation was

41

termination of parental rights. The trial court then recessed the cause until April 3, 2018.

Nolan argues that "[t]he purpose of calling the one witness was to circumvent the one year limitation for automatic dismissal." Rick argues that trial on the merits did not begin until September 25, 2019, and that the February 17, 2019 proceeding "was merely a buffer and a way for the Department to circumvent the one[-]year limitation for automatic dismissal." Citing to *In re D.S.*, 455 S.W.3d 750, 753 (Tex. App.—Amarillo 2015, no pet.), Rick argues that trial did not commence until at least one party presented its opening statement.

In *D.S.*, no witnesses were sworn or gave testimony, and the Amarillo Court of Appeals concluded that "a putative call of the case and an immediate recess" was not a commencement of trial on the merits within the meaning of the statute. *See id.* By contrast in *In re R.F. Jr.*, No. 04-17-00582-CV, 2018 Tex. App. LEXIS 1849 (Tex. App.—San Antonio Mar. 14, 2018, no pet.) (mem. op.), the trial court addressed pretrial motions, and the Department called a witness who testified briefly before the trial court recessed. *Id.* at **3-4. The San Antonio court concluded that the record established that the trial court timely commenced trial on the merits for purposes of section 263.401(a). *See id.* at *4; *see also In re R.J.*, 568 S.W.3d 734, 747 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (witnesses were sworn, the

42

parties announced they were ready to proceed, and a witness for the Department "briefly testified" before the trial court recessed, and the appellate court concluded that such a proceeding was sufficient to establish that trial on the merits had commenced that day); *In re H.B.C.*, 2020 Tex. App. LEXIS 669, at *30 (the trial court called the case, counsel for all parties announced they were ready, pretrial motions were addressed, and a witness was sworn in and gave brief testimony prior to recess, and the appellate court concluded that such a proceeding constituted commencement of trial on the merits and complied with section 263.401(a)).

In this case, the trial court called the case for trial on February 27th, the parties made their announcements, the trial court heard the pre-trial motions, and the State called its first witness who was sworn-in and testified. The order of termination states that the trial court heard the case "[o]n February 27, 2019 through September 30, 2019[.]" We also note that at one point during the bench trial, Rick's attorney mentioned to the court "back in [] February when we first started this trial[.]" Considering the facts in this case, we conclude that trial on the merits commenced on February 17, 2019, and the trial court met the statutory deadline imposed by section 263.401(a). *See* Tex. Fam. Code Ann. § 263.401(a); *In re H.B.C.*, 2020 Tex. App. LEXIS 669, at *30; *In re R.J.*, 568 S.W.3d at 747; *In re R.F. Jr.*, 2018 Tex. App. LEXIS 1849, at **3-4. Accordingly, the trial court did not lack jurisdiction

under section 263.401(a), and we overrule Rick's first issue and Nolan's first and seventh issues.

Challenges to Personal Jurisdiction Over Nolan

Nolan's second issue argues that the trial court lacked personal jurisdiction over him because he was never personally served with the original petition, the first amended petition, or the second amended petition, and his court-appointed attorney filed answers and a counterpetition for him. He argues that he did not personally appear in court after the Department filed its second amended petition.

A party waives service of process if he makes a general appearance:

> The defendant may, in person, or by attorney, or by his duly authorized agent, enter an appearance in open court. Such appearance shall be noted by the judge upon his docket and entered in the minutes, and shall have the same force and effect as if the citation had been duly issued and served as provided by law.

Tex. R. Civ. P. 120. An attorney's appearance on behalf of a defendant in a termination proceeding constitutes the defendant-parent's general appearance and a party waives an alleged defective service where his attorney requests affirmative relief from the court. *See In re D.M.B.*, 467 S.W.3d 100, 103 (Tex. App.—San Antonio 2015, pet. denied); *In re C.T.*, No. 13-12-00006-CV, 2012 Tex. App. LEXIS 10746, at **32-33 (Tex. App.—Corpus Christi Dec. 27, 2012, no pet.) (mem. op.);

44

*In re A.E.G.*, No. 12-11-00307-CV, 2012 Tex. App. LEXIS 8247, at **9-10 (Tex. App.—Tyler Sept. 28, 2012, no pet.) (mem. op.).

In this case, the reporter's record reflects that Nolan personally appeared before the trial court on January 10, 2019. At that hearing, the trial court stated that "[Nolan] has obviously appeared[.]" Nolan admits that his attorney filed answers and a counterpetition on his behalf. The record includes an answer to the Department's second amended petition that was filed for Nolan by his attorney. In his answers to the amended petition, Nolan requested that his parental rights not be terminated, or in the alternative, that he be permitted visitation with his son. During trial, Nolan's attorney moved for a continuance.

On this record, we conclude that Nolan personally appeared before the trial court and that his attorney entered a general appearance by requesting affirmative relief from the court. *See* Tex. R. Civ. P. 120; *In re C.T.*, 2012 Tex. App. LEXIS 10746, at *34. Therefore, the trial court did not lack personal jurisdiction over Nolan, and we overrule Nolan's second issue.

Objections to Notice of Trial

In his second issue, Rick argues that John was never appointed an attorney to represent John at trial, and because John was never properly served notice and "all

parties" did not receive notice of the hearing, the trial court should not have started trial.

A trial court may set a case for trial "with reasonable notice of not less than forty-five days to the parties" or by agreement. *See* Tex. R. Civ. P. 245. The notice requirements of Rule 245 are satisfied by serving the attorney of record. *See In re S.H.*, No. 2-05-174-CV, 2006 Tex. App. LEXIS 213, at **6-8 (Tex. App.—Fort Worth Jan. 12, 2006, no pet.) (mem. op.) (citing Tex. R. Civ. P. 21a; *Bruneio v. Bruneio*, 890 S.W.2d 150, 155 (Tex. App.—Corpus Christi 1994, no writ)). An attorney's knowledge of a trial setting is imputed to his client. *Magana v. Magana*, 576 S.W.2d 131, 134 (Tex. App.—Corpus Christi 1978, no writ). Furthermore, a party challenging a trial court's decision for lack of notice has the burden of proving there was no notice and must produce evidence in addition to an allegation in a motion for new trial. *Welborn-Hosler v. Hosler*, 870 S.W.2d 323, 328 (Tex. App.—Houston [14th Dist.] 1994, no writ).

Rick does not argue that he or his attorney did not receive proper notice under Rule 245—only that John did not receive proper notice. "[A]n appealing party may not complain of errors that do not injuriously affect it or that merely affect the rights of others." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 843 (Tex. 2000); *see also Jordan v. Bustamante*, 158 S.W.3d 29, 39 (Tex. App.—Houston [14th Dist.] 2005,

46

pet. denied). Rick does not identify how *he* was injured by any alleged failure of notice to John, nor did Rick file a motion for new trial on the basis of the lack of notice. *See Welborn-Hosler*, 870 S.W.2d at 328. Therefore, Rick does not have standing to raise this issue.

John did not appeal, and we note that the trial court declared John in default during the hearing held in January 2019. The court also appointed an attorney to represent "any unknown father" of Olivia, and that attorney appeared on behalf of John at trial. Accordingly, the record reflects that John's attorney received notice of trial. *See* Tex. R. Civ. P. 8, 245. We overrule Rick's second issue.

Motion to Strike Amended Pleading

In Rick's third issue, he argues that the trial court erred in allowing the Department to file its second amended petition because his "due process rights were denied." Rick contends that the Department alleged new causes of action against him in the second amended petition—subsections C, F, and H—and by adding new causes of action during trial it was prejudicial to him because he had limited time for discovery and to prepare for trial. The final order of termination found the evidence was sufficient for termination of Rick's parental rights based on subsections D, E, H, and N. Because the final order of termination was not based on subsections C and

47

F, we need not address whether Rick was prejudiced by the Department's assertion of these statutory bases in its second amended pleading. *See* Tex. R. App. P. 47.1.

Rule 63 of the Texas Rules of Civil Procedure provides that a party that files an amended pleading within seven days of trial or thereafter shall be filed only after leave of the trial court which leave shall be granted unless there is a showing that the amendment will operate as a surprise to an opposing party. *See* Tex. R. Civ. P. 63. Similarly, Rule 66 expressly allows for certain trial amendments. *See* Tex. R. Civ. P. 66. The burden of showing surprise or prejudice rests on the party resisting the amendment. *Greenhalgh v. Serv. Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex. 1990).

We review a trial court's decision to grant or strike a pleading amendment for an abuse of discretion. *See id.* at 939-40. On appeal, the party complaining of the court's ruling bears the burden of demonstrating that the trial court erred. *Hardin v. Hardin*, 597 S.W.2d 347, 349 (Tex. 1980).

In this case, the Department filed its second amended petition on May 28, 2019, which was after the initial date the trial had first commenced but several months before the trial finally reconvened in September 2019. Rick filed a motion to strike on July 8, 2019. On July 11, 2019, the court addressed the motion to strike and asked Rick's counsel why there was a delay in filing the motion to strike. Counsel responded that there was no purpose for the delay, and she had just noticed

the second amended pleading and was surprised. In that same hearing, the court recessed the trial for more than sixty days and told Rick's counsel it was denying the motion to strike because "you are on notice."

The trial court has broad discretion in determining whether an unpleaded issue was tried by consent. *See Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 106 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 771-72 (Tex. App.—Dallas 2005, pet. denied) (citing *Whatley v. City of Dallas*, 758 S.W.2d 301, 306 (Tex. App.—Dallas 1988, writ denied)).

At the conclusion of trial, the court stated as follows:

> The Court: I'm looking at the pleadings and I'm going back to the closing and, also, in light of the evidence presented, I'm just trying to determine you're asking to terminate pursuant to what grounds?
> So are you asking for (d) and (e) on all four parents and then with [Mila], in addition to that, you said (o); and then for [Rick], in addition to that, you said (n) and (h); and then with [Nolan], you said in addition to that, letter (o); and then [John], I did not know if there was anything other than that outside of the fact that he's an alleged father --
>
> [Department counsel]: Yes. Yes.
>
> The Court: -- is that correct?
>
> [Department counsel]: Yes, that's correct.

Rick made no objection during the reconvened trial. The final order of termination did not find evidence to support termination based on subsections C or F, and we need not address whether the trial court erred in failing to strike the amended petition

49

to the extent it alleged termination under C or F. On the record before us, we conclude that the trial court did not err in denying the motion to strike because Rick failed to show surprise or prejudice as to the allegations under subsections D, E, H, and N, subsections D, E, and N were previously pleaded in earlier pleadings, and H was tried by consent of the parties. *See* Tex. R. Civ. P. 67; *Eun Bok Lee*, 411 S.W.3d at 106; *In re A.J.B.*, No. 14-02-00794-CV, 2003 Tex. App. LEXIS 5136, at *3 (Tex. App.—Houston [14th Dist.] June 19, 2003, pet. denied) (mem. op.). The trial court did not abuse its discretion in denying Rick's motion to strike the amended pleading, and we overrule Rick's third issue.

## Adjudication of Rick's Paternity

In Rick's fourth issue, he argues that the trial court erred in terminating his parental rights to Jack because there is no order adjudicating Rick's paternity. According to Rick, the final order of termination does not include an adjudication of parentage as to him. Rick argues that his parental rights could not be terminated under section 161.001 because termination under 161.001 only applies where an alleged father has filed an admission of paternity. Rick further argues that where an alleged father does not respond by timely filing an admission of paternity or a counterclaim of paternity, parental rights may only be terminated under section 161.002(b)(1). *See* Tex. Fam. Code Ann. § 161.002(b)(1).

50

On February 22, 2019, Rick filed an original answer representing himself as "Respondent father[.]" On April 1, 2019, Rick filed a counterpetition in which he requested genetic testing and adjudication of parentage as to Jack and another child. At trial, State's Exhibit 8 was admitted, titled "DNA Test Report" for the child Jack and the "alleged Father" Rick. The report states:

> The alleged father is not excluded as the biological father of the tested child. Based on testing results obtained from analyses of the DNA loci listed, the probability of paternity is 99.99995%.

Rick had no objection to the admission of the DNA test results at trial. On July 29, 2019, Rick filed a motion for visitation in which he alleged that he "was found to be the father of [Jack] via DNA testing on or about May 13, 2019." During his testimony at trial, Rick agreed that he was the father of Jack and that he knows that "for sure" now because of the DNA test results. At the conclusion of his testimony, the following exchange occurred:

> THE COURT: Okay. So, sir, again, I'm a little bit confused as to what you're asking the Court to do today. So your son's name is, for the record?
>
> [Rick]: [Jack].
>
> . . . .
>
> THE COURT: Okay. And what are you asking the Court to do today, sir?

51

[Rick]: I just want to be able to see my son and keep my rights to be a parent.

When the trial court announced the ruling from the bench, it stated "I am finding that [Rick] is and is adjudicated as the father of the child, [Jack], pursuant to genetic testing." The final order of termination terminated "the parent-child relationship" between Rick and Jack. Rick did not file a request for findings of fact or conclusions of law in the trial court.

A party's testimonial declarations that are contrary to his position are quasi-admissions that are "some evidence[]" but not conclusive upon the admitter. *See Oliver v. Oliver*, No. 09-18-00208-CV, 2020 Tex. App. LEXIS 2151, at *23 (Tex. App.—Beaumont Mar. 12, 2020, no pet. h.) (citing *Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980)). A judicial admission "'results when a party makes a statement of fact which conclusively disproves a right of recovery or defense currently asserted.'" *Louviere v. Hearst Corp.*, 269 S.W.3d 750, 755 (Tex. App.—Beaumont 2008, no pet.) (quoting *Brown v. Lanier Worldwide, Inc.*, 124 S.W.3d 883, 900 (Tex. App.—Houston [14th Dist.] 2004, no pet.)).

> To be treated as a judicial admission, a party's statement must meet five requirements: (1) the statement relied on is made during the course of a judicial proceeding; (2) the statement is contrary to an essential fact embraced in the theory of recovery or defense asserted by the person making the statement; (3) the statement is deliberate, clear, and

unequivocal; (4) giving conclusive effect to the statement will be consistent with the policy on which the judicial admission rule is based; and (5) the statement is not also destructive of the opposing party's theory of recovery.

*Id.* at 754-55. Other courts have concluded that "[t]here are no formalities that must be observed when filing an admission of paternity or for such admission to be effective." *See In re U.B.*, No. 04-12-00687-CV, 2013 Tex. App. LEXIS 1052, at *4 (Tex. App.—San Antonio Feb. 6, 2013, no pet.) (mem. op.) (citing *In re G.A.G.*, No. 04-07-00243-CV, 2007 Tex. App. LEXIS 8960, at **3-4 (Tex. App.—San Antonio Nov. 14, 2007, no pet.) (mem. op.)). Our Court has concluded that an admission of paternity in an original answer is a judicial admission of paternity sufficient to support an order of termination under section 161.001. *See In re K.P.*, No. 09-13-00404-CV, 2014 Tex. App. LEXIS 9263, at **34-35 (Tex. App.—Beaumont Aug. 21, 2014, no pet.) (mem. op.) (where father's pleadings and his testimony represented himself as the child's father, evidence of paternity was sufficient for termination under section 161.001).

The trial court made a finding on the record that Rick was Jack's father based on the paternity tests. Additionally, Rick made a judicial admission in his pleadings and in his testimony that he was Jack's father. *See id.* At trial, Rick did not object to the results of the DNA testing and he did not object to parentage. The trial court adjudicated Rick's parentage of Jack in its oral ruling, and the order of termination

terminated the parent-child relationship between Rick and Jack. We conclude that Rick failed to preserve error on this issue, and the trial court did not err by terminating Rick's parental rights under section 161.001. *See* Tex. R. App. P. 33.1(a); *In re K.P.*, 2014 Tex. App. LEXIS 9263, at \*\*34-35. We overrule Rick's fourth issue.

Admission of Rick's Drug Test Results

In Rick's eleventh issue he contends that the trial court improperly admitted drug test results as business records. According to Rick, the drug test results were admitted through a business records affidavit, and the sponsoring witness had no personal knowledge of the drug test or methodology used.[6]

We review the admission of evidence for an abuse of discretion. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). "To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was erroneous and that the error was calculated to cause, and probably did cause, 'rendition of an improper judgment.'" *Benavides v. Cushman, Inc.*, 189 S.W.3d 875, 879 (Tex. App.—Houston [1st Dist.]

---

[6] At trial, Rick's attorney objected to the exhibit based on a lack of foundation, untimely filing of the affidavit, hearsay, and lack of a chain of custody. At no point did Rick's attorney argue that the affiant in the business records affidavit lacked personal knowledge of the drug tests or the methodology used for the test.

2006, no pet.) (quoting Tex. R. App. P. 44.1(a)(1); *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998)). In conducting this harm analysis, we review the entire record. *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 754 (Tex. 1995); *Benavides*, 189 S.W.3d at 879. Evidentiary rulings do not usually cause reversible error unless an appellant can demonstrate that the judgment turns on the particular evidence that was admitted or excluded. *Able*, 35 S.W.3d at 617; *Alvarado*, 897 S.W.2d at 753-54; *Benavides*, 189 S.W.3d at 879. The erroneous admission of evidence is harmless if the evidence is merely cumulative of other evidence admitted at trial. *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).

In his testimony, Rick admitted that he had tested positive for cocaine during the pendency of the case. The trial court could have regarded Rick's testimony as a judicial admission that was conclusive as to this issue. *See Louviere*, 269 S.W.3d at 755. And, the affidavit with copies of the drug tests would have been cumulative of other evidence admitted at trial on this issue. Even assuming without deciding that the trial court erred in admitting the drug test results and the business records affidavit, after reviewing the entire record, we conclude that Rick has not shown reversible error. *See Benavides*, 189 S.W.3d at 879; *Able*, 35 S.W.3d at 617. We overrule Rick's eleventh issue.

55

## Endangerment Under D and E

All three Appellants challenge the sufficiency of the evidence to support termination under subsections D and E. In two issues, Nolan argues that he was not living with Mila at the time of removal, and there is no evidence he had personal knowledge of the condition of the home. And, Nolan contends there is no evidence he engaged in abuse, violent conduct, or domestic violence, that, without more, being in prison is not an endangering course of conduct, and there is no evidence he has a substance abuse problem.

Similarly, in two issues, Rick argues that he was not living with Mila at the time of removal, had no knowledge of the condition of Mila's home, and his criminal history does not show a pattern of being convicted or criminal activity. Rick also argues that termination of a father's parental rights under subsection D requires that the father have knowledge of paternity because subsection D requires a parent's "knowing" conduct. Rick argues that termination under subsection E was error because the Department failed to plead for termination under that subsection in its first and second amended petitions.

Mila argues that the evidence was factually insufficient on whether the conditions of the home endangered the children's physical or emotional well-being. Mila also argues that she had requested that the landlord make repairs to the home,

and that many of the bags in the home were not trash, but clothes. She also argues that she had no knowledge that John was using marijuana in the home.

Under subsection D, parental rights may be terminated if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(D). Under subsection E, parental rights may be terminated if clear and convincing evidence supports that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

Under subsection D, parental rights may be terminated based on a single act or omission by the parent. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)). Subsection D requires the endangerment to the child be the direct result of the child's environment. *See In re K.P.*, 2014 Tex. App. LEXIS 9263, at *38. In evaluating endangerment under subsection D, we consider the child's environment before the Department obtained custody of the child. *See In re J.L.V.*, No. 09-19-00316-CV, 2020 Tex. App. LEXIS 2070, at *34 (Tex. App.—Beaumont Mar. 11, 2020, no pet. h.) (mem. op.) (citing *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—

57

Houston [14th Dist.] 2014, pet. denied)). It is not necessary that the parent know for certain that the child is in an endangering environment; rather, awareness of the potential for danger and a disregard of the risk is enough to show endangering conduct. *See In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Subsection D cannot constitute the basis for termination if the parent was unaware of the endangering environment. *See In re C.M.C.*, 554 S.W.3d at 171-72 (citing *In re T.H.*, 131 S.W.3d 598, 603 (Tex. App.—Texarkana 2004, pet. denied)).

Termination under subsection E requires more than a single act or omission and a "voluntary, deliberate, and conscious course of conduct by the parent is required." *See In re L.E.S.*, 471 S.W.3d at 923 (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)); *see also In re C.M.C.*, 554 S.W.3d at 172. Under subsection E, a court may consider conduct occurring before and after a child's birth to establish a course of conduct. *See id.* (citing *In re S.M.*, 389 S.W.3d 483, 491-92 (Tex. App.—El Paso 2012, no pet.)). Because the evidence of statutory grounds D and E is often interrelated, we may consolidate our review of the evidence supporting these grounds. *See In re J.L.V.*, 2020 Tex. App. LEXIS 2070, at *33 (citing *In re M.Y.G.*, 423 S.W.3d 504, 510 (Tex. App.—Amarillo 2014, no pet.)); *In re J.B.*, No. 09-16-

58

00442-CV, 2017 Tex. App. LEXIS 4543, at *23 (Tex. App.—Beaumont May 18, 2017, no pet.) (mem. op.).

Generally, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Although incarceration alone will not support termination, evidence of criminal conduct, convictions, and imprisonment together with other conduct may support a finding of endangerment under subsection E. *See In re A.R.M.*, No. 14-13-01039-CV, 2014 Tex. App. LEXIS 3744, at *21 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.); *In re R.W.*, 129 S.W.3d at 743 (father's criminal history and resulting imprisonment alone was insufficient to support an endangerment finding, but when considered with the evidence of father's history of substance abuse, mental instability, and sexual misconduct, such evidence provides further proof of a course of conduct that endangered the child's well-being); *In re J.T.G.*, 121 S.W.3d 117, 133 (Tex. App.—Fort Worth 2003, no pet.) (evidence of father's prior criminal conduct was relevant to endangerment determination). Abusive or violent conduct by a parent may also produce a home environment that endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

In addition, a pattern of drug abuse will also support a finding of conduct endangering a child even if there is no evidence that such drug use actually injured the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). A history of illegal drug use and drug-related criminal activity is conduct that subjects a child to a life that is uncertain and unstable, endangering the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ); *see also S.R.*, 452 S.W.3d at 361-62 (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (illegal drug use may support termination under subsection E because "it exposes the child to the possibility that the parent may be impaired or imprisoned[]"). A parent's continued drug use when the custody of his child is in jeopardy supports a finding of endangerment. *See In re S.R.*, 452 S.W.3d at 361-62; *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc). A parent's drug use, incarcerations, incidents of domestic violence, criminal history, and employment and housing instability prior

60

to and during the case create a course of conduct from which the factfinder may determine the parent endangered the child's emotional and physical well-being. *See In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at \*\*15-16 (Tex. App.—Beaumont Apr. 11, 2019, no pet.) (mem. op.); *see also Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 534 (Tex. 1987); *In re D.O.*, 338 S.W.3d 29, 36-37 (Tex. App.—Eastland 2011, no pet.); *In re V.V.*, 349 S.W.3d 548, 553-54 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

"[N]eglect can be just as dangerous to the well-being of a child as direct physical abuse." *In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996). A parent who continually exposes the child to unsanitary living conditions, continued uncleanliness, insect infestation, and the lack of attention to medical needs is evidence of an endangering environment. *See id.* at 269-70; *In re K.S.O.B.*, No. 01-18-00860-CV, 2019 Tex. App. LEXIS 2490, at \*38 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.); *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.) In addition, a court may consider a parent's failure to complete a service plan as part of its analysis of endangering conduct. *See In re J.B.*, 2017 Tex. App. LEXIS 4543, at \*\*22-23 (citing *In re R.F.*, 115 S.W.3d 804, 811 (Tex. App.—Dallas 2003, no pet.)).

Termination Under D and E as to Nolan

In this case, Mila testified that Nolan "makes stupid decisions[]" and had a history of criminal theft. Mila also testified that Nolan did not have a place for Junior to live and did not have a stable living situation. Nolan's attorney told the court that Nolan had fled from a criminal prosecution to New York and Nolan was not present at trial. Nolan's 2019 indictment for possession of cocaine was admitted into evidence. The Caseworker testified that Nolan had some visitations with Junior, but that Nolan informed her he was "on the run[]" and unable to have additional visitations. And in the Caseworker's opinion, Nolan did not have stability, permanency, or a home where Junior could live. The undisputed evidence reflects that Nolan fled from a criminal prosecution to another state during the pendency of the trial and that he knew he would not be able to see his son because he was "on the run." We conclude that the trial judge could have reasonably formed a firm belief or conviction that termination of Nolan's parental rights was supported under subsection D. *See In re J.F.C.*, 96 S.W.3d at 264-65; *In re L.E.S.*, 471 S.W.3d at 925.

In addition, we also conclude that the record supports termination of Nolan's parental rights to Junior based on endangerment under subsection E. The evidence reflects that Nolan had a criminal history including criminal drug possession. The Caseworker testified that Nolan's flight from the jurisdiction prevented him from

62

having visitations with Junior, and that Nolan lacked stability, permanency, or a place for Junior to live. Considering the entire record, we conclude that the trial judge could have reasonably formed a firm belief or conviction that termination of Nolan's parental rights was proper under subsection E. *See In re J.F.C.*, 96 S.W.3d at 264-65. We conclude the Department established, by clear and convincing evidence, that Nolan committed the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment findings is not so significant that the court could not reasonably have formed a firm belief or conviction that Nolan endangered Junior. *See In re J.F.C.*, 96 S.W.3d at 266. We overrule Nolan's third and fourth issues.

Termination Under D and E as to Rick

The Department's original petition sought to terminate Rick's parental rights to Jack under subsections D, E, F, K, M, N, and O. In its first amended petition, the Department sought termination of Rick's parental rights under subsections D, K, N, and O. The Department's second amended petition sought termination of Rick's parental rights under subsections C, D, F, H, K, N, and O. Therefore, in the live pleading at the time of trial, the Department had not pleaded termination under

63

subsection E. *See* Tex. R. Civ. P. 65; *TransDesign Int'l, LLC v. SAE Towers, Ltd.*, Nos. 09-18-00080-CV & 09-18-00081-CV, 2019 Tex. App. LEXIS 5429, at *2 n.3 (Tex. App.—Beaumont pet. denied) (mem. op) (explaining that an amended pleading supersedes an earlier pleading). Nevertheless, as we have already explained herein, on this record, the trial court did not abuse its discretion in concluding that the parties tried by consent termination under subsection E. *See* Tex. R. Civ. P. 67; *Eun Bok Lee*, 411 S.W.3d at 106. We further conclude that Rick failed to preserve his argument that the Department did not plead termination under subsection E by his failure to timely object at trial. *See* Tex. R. App. P. 33.1(a).

The record reflects that Rick tested positive for cocaine and marijuana during the pendency of the trial, and the Caseworker testified that Rick did not do any further drug screens after the positive test result. Mila testified that Rick used marijuana during their relationship, and at that time Mila had three children. Rick was aware he tested positive for cocaine during the case, but he denied using any drugs other than cocaine.

Mila testified that Rick knew how to contact her, yet he did not do so. Rick testified that he desired visits with Jack and had requested visitation through his attorney, but the Caseworker did not allow it. The Caseworker testified that Rick had not provided information about the family members where Rick preferred for Jack

64

to live. The Caseworker also testified that Rick did not return her calls or submit to all drug tests and that his "substance issue" was not addressed. Rick agreed he had not returned calls from the Caseworker or CASA to set up visitations.

The trial court could have concluded that Rick's use of cocaine and marijuana during the pendency of this case and his refusal to submit to more than one test constituted a course of conduct that created an environment with a potential for danger to Jack that Rick was aware of but consciously disregarded. *See In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.); *In re S.M.L.*, 171 S.W.3d at 477. In addition, the trial court could have concluded that Rick's lack of responsiveness to the Caseworker or progress on his service plan created an environment with a potential for danger to Jack of which Rick was aware. *See In re J.B.*, 2017 Tex. App. LEXIS 4543, at \*\*22-23. We conclude the Department established, by clear and convincing evidence, that Rick committed the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment findings is not so significant that the court could not reasonably have formed a firm belief or conviction that Rick endangered Jack. *See In re J.F.C.*, 96 S.W.3d at 266. We overrule Rick's fifth and sixth issues.

Termination Under D or E as to Mila

Officer Lupnitz testified that Mila's home was "extremely dirty[,]" had holes in the walls, exposed electrical wiring, and roaches "crawling over everything." Lupnitz also testified that he arrested John and another man at the home for possession of marijuana and paraphernalia when children were in the home, and that drugs and paraphernalia in the home were within reach of the children. The Investigator testified that Mila's home was dirty and in disrepair and was "one of the worst homes" she had seen. The Investigator testified that the dirty conditions of the home contributed to an endangering situation. Mila testified that she knew the home was "raggedy" when she moved in, but that she had requested that the landlord make repairs.

Mila also testified that the father of one of her children had physically abused her and injured her eye. The Foster Mother testified that Mila had told her John had threatened to hit her if she did not make him a sandwich. Mila testified that she knew that John smoked marijuana on a regular basis, although she denied he smoked in the home. Mila testified she had not provided the Department with any information about the boyfriend with whom she was living at the time of trial. The Caseworker testified that, although Mother completed parenting classes and a psychological assessment, she had not completed a drug evaluation, and Mother lacked appropriate

66

housing for her children. The Investigator testified that the current case was opened just a few weeks after a previous CPS case relating to an allegation of John's drug use at the home. The Foster Mother testified that Jack and Olivia were unhealthy and had untreated medical needs at the time the children went to live with the Fosters.

Deferring to the trial court's credibility determinations and reviewing all the evidence in the light most favorable to the termination findings under subsections D and E, the trial court could reasonably have formed a firm belief or conviction that Mila, through her individual acts or omissions and a course of conduct, endangered Junior's, Jack's, and Olivia's physical or emotional well-being. We conclude the Department established, by clear and convincing evidence, that Mila committed the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment findings is not so significant that the court could not reasonably have formed a firm belief or conviction that Mila endangered Junior, Jack, and Olivia. *See In re J.F.C.*, 96 S.W.3d at 266. We overrule Mila's first and second issues.

Constructive Abandonment by Rick

In Rick's eighth issue, he argues there is insufficient evidence that he constructively abandoned Jack to support termination under subsection N.

67

According to Rick, he did not know Jack was his child until the DNA results were filed on May 21, 2019. He also argues that the evidence shows that he attempted to get visitation with Jack, but the Department "refused[.]" Rick also argues that he never received a service plan. According to Rick, the evidence reflects that he had stable employment and a home environment with family.

Under subsection N, the Department had the burden to prove by clear and convincing evidence that Rick:

> . . . constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:
> (i) the department has made reasonable efforts to return the child to the parent;
> (ii) the parent has not regularly visited or maintained significant contact with the child; and
> (iii) the parent has demonstrated an inability to provide the child with a safe environment[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(N); *see also In re C.M.C.*, 554 S.W.3d at 169. The first element of subsection N focuses on the Department's conduct, and the proper inquiry is whether the Department made reasonable—not ideal—efforts to return the child to the parent. *See In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *In re M.V.G.*, 440 S.W.3d 54, 61 (Tex. App.—Waco 2010, no pet.). Implementation of a family service plan is ordinarily considered a reasonable effort by the Department to return a child to his or her

parent. *See In re A.H.*, No. 09-19-00167-CV, 2019 Tex. App. LEXIS 8842, at *11 (Tex. App.—Beaumont Oct. 3, 2019, no pet.) (mem. op.); *In re K.C.*, No. 07-18-00282-CV, 2018 Tex. App. LEXIS 10774, at *9-10 (Tex. App.—Amarillo Dec. 21, 2018, pet. denied) (mem. op); *In re N.R.T.*, 338 S.W.3d 667, 674 (Tex. App.—Amarillo 2011, no pet.). The second and third elements focus on the parent's conduct. *See In re A.L.H.*, 468 S.W.3d at 744.

Mila testified that she told Rick she was pregnant with Jack and that Rick was the father. Mila also testified that Rick visited the baby at the hospital and had bought Jack clothes and a car seat. According to Mila, it was "clear" between Mila and Rick that he was Jack's father, and Rick had never denied he was Jack's father. Mila also testified that on the day the police arrived and arrested John, Rick was going to pick up Jack from her parents' house. Rick admitted at trial that Mila had told him she was pregnant. We assume the trial court resolved any disputed facts in favor of its finding, and we defer to the trial court's assessment of the credibility of the witnesses. *See In re J.O.A.*, 283 S.W.3d at 344-45; *In re H.R.M.*, 209 S.W.3d at 109. On this record, the trial court could have concluded from the evidence at trial that Rick had knowledge of his paternity of Jack when Mila was pregnant or when Jack was born.

The Department was named temporary managing conservator of Jack on March 9, 2018. Trial commenced in this case on February 27, 2019 and concluded on September 30, 2019. Eleven months lapsed between Jack's placement in the temporary managing conservatorship of the Department and commencement of trial. The Caseworker testified that she prepared and filed a service plan for Rick. The Caseworker testified that she called and texted Rick several times about setting up visitations, but "there was no response[]" and Rick never received visitation through the Department. The Caseworker also testified that she had attempted to assess a family member's home as a possible placement for Jack. The Caseworker believed that Rick had not demonstrated the ability to provide a safe and stable environment for Jack, he lacked permanency, and he failed to provide information to the Department about the home where Rick intended for Jack to be placed. The CASA testified that she had been informed that Rick wanted to wait until after the DNA results were available to have a visit with Jack, but that she never heard back from Rick despite calling and texting him multiple times.

Rick agreed at trial that he had not asked the Caseworker about visitation and that he failed to return the Caseworker's calls. He also agreed he did not respond to the CASA's texts about setting up visitation. Rick testified that neither the Department nor CASA had come to his home. He also agreed that he tested positive

for cocaine during the pendency of the trial. Rick also admitted at trial that he was not asking for Jack to be placed with him and he did not know when he would be ready to have custody because he needed to "get better on [his] feet."

On this record, the trial court could have concluded, based on clear and convincing evidence, that the Department made reasonable efforts to return the child to the parent, that Rick did not regularly visit or maintain significant contact with Jack, and that Rick had demonstrated an inability to provide the child with a safe environment. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N); *In re C.M.C.*, 554 S.W.3d at 169-70. We conclude that evidence is legally and factually sufficient to support termination under subsection N, and we overrule Rick's eighth issue.

Because only one statutory basis is required to support termination of parental rights, we need not consider Rick's seventh issue regarding the sufficiency of the evidence under subsection H. *See In re A.V.*, 113 S.W.3d at 362. We also need not address Nolan's or Mila's challenges to the sufficiency of the evidence to support termination under subsection O. *See* Tex. R. App. P. 47.1; *In re A.V.*, 113 S.W.3d at 362. We overrule Nolan's fifth issue and Mila's third issue.

## Best Interest of the Children

All three parents challenge the trial court's determination that termination of their parental rights was in the best interest of the children. Trial courts have wide

latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). Nevertheless, there is a strong presumption that the best interest of a child is served by keeping the child with his or her parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

The Family Code outlines factors to be considered in determining whether a parent is willing and able to provide a safe environment for a child. *Id.* § 263.307(b). There are several factors that may be considered when determining whether termination of parental rights is in the best interest of the child, including: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544

S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No particular *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citing *C.H.*, 89 S.W.3d at 27); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). Stability and permanence weigh heavily in considering a child's best interest. *See In re J.D.*, 436 S.W.3d 105, 119-20 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied)).

When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent. *In re S.R.*, 452 S.W.3d at 369 (citing *In re J.D.*, 436 S.W.3d at 118). A factfinder may consider the child's fear of a parent in making a best-interest determination. *See In re E.R.*, No. 01-17-00503-CV, 2017 Tex. App. LEXIS 11163, at **31-32 (Tex. App.—Houston [1st Dist.] Nov. 30, 2017, pet. denied) (mem. op.). When a child is unable to express his desires due to her young age, a trial court may consider whether the child has bonded with

the foster parents and whether she calls a foster parent "mommy" or "daddy." *See In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

The best-interest determination may rely on direct or circumstantial evidence, subjective factors, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d at 677. If, in light of the entire record, no reasonable factfinder could form a firm belief or conviction that termination was in the children's best interest, then we must conclude that the evidence is legally insufficient to support termination. *See In re J.F.C.*, 96 S.W.3d at 266.

In his sixth issue, Nolan argues that the record lacked clear and convincing evidence of Junior's psychological assessment. Nolan further argues that the Caseworker did not testify as to specific examples about Junior or how Nolan would impair Junior's physical health of emotional welfare. He also argues that the testimony about Nolan's living arrangements came from Mila, who was "an adverse witness" with no personal knowledge. In addition, Nolan argues that Officer Lupnitz testified that he did not believe the children were abused or neglected and that the record is silent on programs available to assist Nolan.

In Rick's ninth issue, he argues that the Department failed to provide any evidence that he is unable to support or provide a stable environment for Jack.

According to Rick, the Department "refused" to provide visitation between Rick and Jack, despite Rick having requested visitation. In addition, Rick argues that "the record contains no evidence of magnitude, frequency, and circumstances of harm, if any" to Jack.

In Mila's fourth issue, she argues that there was no testimony that termination was the only option to achieve permanency, stability, or safety for the children. She also argues that Junior was not placed in a home where adoption was planned, so that "there was nothing permanent or stable about" the plans for Junior's life. According to Mila's fourth and fifth issues, the Department failed to rebut the strong presumption that maintaining the parent-child relationship serves the children's best interest and that the record evidence did not amount to more than a scintilla of evidence on the best interest of the children.

Officer Lupnitz and the Investigator testified that the children's home was extremely dirty, had holes in the floor and walls, and was crawling with roaches. The Officer also testified that exposed wiring in the home was a danger to the children. The Investigator testified that the home was one of the worst homes she had seen because it was unsafe, dirty and smelled of garbage. Photos of Mila's home were admitted into evidence. Mila testified that the home was "raggedy" when she

moved in, that she knew the home needed repairs, and that she stayed in the home even after the landlord did not make repairs as she had requested.

Mila testified that the father of one of her children had been abusive toward her, and the Foster Mother testified that Mila had told her John threatened to hit her. According to Mila, Nolan had a history of criminal theft cases and that she was unable to divorce him because of his legal issues. Mila also testified that Rick used marijuana when he and Mila were in a relationship, and that she knew John smoked marijuana every other day. Mila testified that she had provided no information to the Department about her current boyfriend, with whom she was living. The officer testified that drugs and paraphernalia were in the home within reach of the children, including marijuana stored in a baby formula can.

At the time of trial, Nolan had fled the jurisdiction while he was being tried. Mila testified that Nolan had stolen televisions from Walmart, and an indictment for Nolan on the charge of possession of cocaine and a capias for his arrest were admitted into evidence. Rick tested positive for cocaine and marijuana during the pendency of the trial. Although there were no allegations of drug use by Mila, she refused to take drug tests and a drug assessment.

According to the Caseworker, none of the parents had completed their service plans. The Caseworker testified that none of the three parents had demonstrated

stable housing for the children. According to the Caseworker, Nolan had made a few visitations with Junior, but failed to make any visits after he told her he was "on the run." The Caseworker testified that Rick had not made any visitations with Jack and that Rick did not return her calls or messages. The Caseworker also testified that, although Mila made several visitations with the children (only when transportation was provided by the Department), she did not show progress on other requirements of her service plan except for completion of parenting classes and an intake with a counselor. The Caseworker testified that Mila lacked permanency and appropriate housing for the children. The Caseworker also testified that Rick had no relationship with Jack and that Jack did not know Rick as his father. The Caseworker expressed concerns that Rick had not continued drug testing after he tested positive, and that Mila had failed to provide a clean drug test after having the children removed from her home in part due to John's repeated drug use in the home.

The Foster Parents testified that when Jack and Olivia came to their home, the children had untreated medical issues. The Caseworker testified that Junior had problems with oppositional defiant behaviors. Jack and Olivia had problems with sleeping and night terrors, and both children initially showed serious fears if left in a room with a closed door. The Foster Parents also testified that Jack and Olivia would dig in the garbage for food when they first came to the Fosters' home. The

Foster Parents testified that Jack and Olivia now call them "mommy" and "daddy," and the children had largely overcome their problems with sleeping and being in a room with a closed door. The Fosters had gotten medical treatment for Jack and Olivia's issues with asthma and allergies. The Caseworker testified that Junior was doing well in his current placement.

The CASA testified that termination of parental rights as to all three children was in the children's best interest because the parents were not providing stability for the children and primary custody by the parents would substantially impair the children's physical health or emotional welfare. The Caseworker also testified that it was in the children's best interest for parental rights to the children to be terminated and for all three children to be adopted by their current caregivers. According to the Caseworker, the Foster Parents were willing to adopt Jack and Olivia, and she believed there was a strong possibility that the family with whom Junior was placed would adopt him.

Deferring to the trial court's determination of the witnesses' credibility, on this record, we conclude that the evidence is legally and factually sufficient to support the trial court's findings that terminating Nolan's, Rick's, and Mila's rights was in Junior's, Jack's, and Olivia's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. On this record, we conclude that the evidence was sufficient to produce in the mind

of the trial court a firm belief or conviction that termination of Nolan's, Rick's, and Mila's rights was in the children's best interest. *See In re C.H.*, 89 S.W.3d at 25. We overrule Nolan's sixth issue, Rick's ninth issue, and Mila's fourth and fifth issues.

Appointment of Department as Managing Conservator

Nolan's eighth issue and Rick's tenth issue argue that the trial court abused its discretion in naming the Department as permanent managing conservator of the children. According to Rick, Texas law establishes a rebuttable presumption that it is in the child's best interest for the parents to be named joint managing conservators. Rick argues that the Department and CASA failed to provide any evidence as to how it would not be in Jack's best interest for Rick to have permanent managing conservatorship. Nolan argues that the Department did not put on any evidence of its ability to act as managing conservator of Junior.

Conservatorship determinations are subject to review for abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). We reverse the trial court's appointment of a managing conservator only if we determine it was arbitrary or unreasonable. *In re N.T.*, 474 S.W.3d 465, 479 (Tex. App.—Dallas 2015, no pet.) (citing *In re J.A.J.*, 243 S.W.3d at 616). "A trial court does not abuse its discretion in appointing the Department as conservator of the children where the evidence is

sufficient to support termination of parental rights." *In re S.R.*, 452 S.W.3d at 359 n.3.

When the parents' rights are terminated, as here, section 161.207 of the Family Code controls the appointment of a managing conservator. *See In re I.L.G.*, 531 S.W.3d 346, 356-57 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Section 161.207(a) provides, in relevant part:

> If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child.

Tex. Fam. Code Ann. § 161.207(a).

We have already concluded that the evidence supporting termination of Nolan's and Rick's parental rights was legally and factually sufficient under section 161.001(b). Accordingly, applying section 161.207, the trial court did not abuse its discretion in appointing the Department as sole managing conservator of Junior and Jack. *See In re I.L.G.*, 531 S.W.3d at 357 (citing *In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.—Houston [14th Dist.] 2016, pet. denied)).[7] We overrule Nolan's eighth issue and Rick's tenth issue.

---

[7] *See also In re A.A.H.*, Nos. 01-19-00612-CV & 01-19-00748-CV, 2020 Tex. App. LEXIS 1915, at **64-65 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, no pet. h.) (mem. op.) (explaining that because an order terminating parental rights divests the parent of all legal rights and duties with respect to the child, that parent does not

Having overruled all the Appellants' issues, we affirm trial court's final order.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on March 10, 2020
Opinion Delivered April 30, 2020

Before McKeithen, C.J., Kreger and Johnson, JJ.

---

have standing to challenge that portion of the termination order appointing the Department as permanent managing conservator because any alleged error could not injuriously affect that parent's rights).